**ORDERED.**

**Dated: September 23, 2026**

Jacob A. Brown
Chief United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

*In re*: Case No. 3:25-bk-02562 JAB

Mark Albert Lowery, Chapter 11

Debtor.
_________________________/

Catamount Constructors Inc., Adv. No. 3:25-ap-00107-JAB

Plaintiff,

v.

Mark A. Lowery,
JAX Refrigeration, LLC, and
XAJ Holding, Inc.,

Defendants.
_________________________/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Adversary Proceeding came before the Court for Trial on June 4, 2026 (the "Trial") on Plaintiff, Catamount Constructors Inc.'s ("Catamount") Complaint (the "Complaint") asserting I) Breach of Contract (against JAX Refrigeration, LLC ("JAX")) ("Count I"), II) Fraudulent Transfer under Fla. Stat. § 726.105(1) (against

all Defendants) ("Count II"), III) Fraudulent Transfer under Fla. Stat. § 726.106(1) (against all Defendants) ("Count III"), IV) Piercing of the Corporate Veil (against JAX and Mark A. Lowery ("Lowery")) ("Count IV"), and V) Exception to Discharge under 11 U.S.C. § 523(a)(2) (against Lowery) ("Count V").[1] Based on the evidence presented at Trial, relevant pleadings, and other filings in this Proceeding, the Court makes the following Findings of Fact and Conclusions of Law.[2]

## Findings of Fact

### A. JAX Refrigeration, LLC and Catamount's Contracts

On July 1, 2021, Catamount entered into a construction contract with Marmaxx Operating Corp., a Virginia Corporation, as the general contractor for a construction project known as TJX Marshalls Distribution Center in El Paso, Texas (the "Project"), with a planned completion date of December 1, 2022.[3] On July 8, 2020, Catamount and JAX entered into a master subcontract agreement (the "Master Subcontract") for all projects in which Catamount engaged JAX and agreed to execute a work authorization for each project, detailing the scope of work and other project-specific information.[4] On September 29, 2021, Catamount and JAX entered into a project-specific work authorization (the "Work Authorization"), incorporating the Master

---

[1] Adv. Doc. 1. Plaintiff and Defendants will be collectively referred to as the "Parties."
[2] *See* Fed. R. Bankr. P. 7052.
[3] Plaintiff's Ex. 1.
[4] Plaintiff's Ex. 2.

Subcontract by reference, for JAX to furnish and install complete plumbing for the Project, for a price of $2,661,527.00.[5]

The Work Authorization outlined the scope of the Project[6] and the project schedule (the "Schedule").[7] The Schedule required that: 1) the 3-week look ahead schedule be updated weekly, 2) submittals be provided within seven days of the award, 3) the underground for roof drains be completed within 14 days and noted it is the sequence ahead of slab pours, 4) the underground for office areas be completed within 27 days, and 5) the overhead plumbing and roof drains be completed within 106 days and noted it is the sequence ahead of mezzanine erection.[8] The Work Authorization clearly stated, JAX was solely responsible for delivering all submittals per the specifications in the Schedule as to not delay the Project.[9] The Project Subcontract required JAX to complete its work in a prompt, diligent, and workmanlike manner and required JAX to complete its scope of work in strict accordance with all plans, specifications, drawings, and other requirements listed.[10]

The Master Subcontract required that JAX at all times have a sufficient number of properly skilled workers, sufficient amount of material and supplies to efficiently and promptly complete the Project, and it not employ unfit persons who were not

---

[5] Plaintiff's Ex. 3 at ¶ 2. Together the Work Authorization and Master Subcontract will be referred to as the "Project Subcontract."
[6] *Id.*
[7] *Id.* at ¶ 5.
[8] *Id.*
[9] *Id.* at 4 ¶ s.
[10] *See* Plaintiff's Ex. 2 at ¶ 1; Plaintiff's Ex. 3 at ¶ 2.

skilled in the tasks assigned to them.[11] The Master Subcontract required JAX to properly man, equip, coordinate and complete its work efficiently, to maintain the Schedule, and to avoid and prevent any delay, hindrance to, disruption, or interference with the progress of other trades or the completion of the Project.[12]

Prior to and throughout the course of the Project, Catamount conducted meetings, at which JAX was required to have representatives in attendance.[13] JAX was also required to submit claims in writing to Catamount for additional cost, extra work, extensions of time, and any other issue within five days of JAX reasonably knowing of the circumstances giving rise to the need to make a claim.[14] JAX was required to reimburse Catamount for all expenses incurred, and fully defend, indemnify, and hold Catamount harmless from and against: (1) any and all liquidated or actual delay or disruption damage and (2) any and all other liability resulting in any manner whatsoever, directly or indirectly, from any and all delays, disruptions, or interferences caused by JAX.[15]

If JAX failed to comply with any provision of the Master Subcontract, Catamount, upon 24 hours' written notice, had the right to declare JAX in breach and terminate the Project Subcontract.[16] Upon termination, JAX would be liable to Catamount for the expense to correct, replace, or complete its work, together with any

[11] Plaintiff's Ex. 2 at ¶ 11.
[12] *Id.* at ¶ 5.
[13] *Id.* at ¶ 12.
[14] *Id.* at ¶ 17.
[15] *Id.* at ¶ 18.
[16] *Id.* at ¶ 19a.

liquidated damages attributable to delays caused by JAX's performance that exceeded the unpaid balance of the Work Authorization.[17] Catamount had no obligation to provide additional notice to JAX beyond the initial 24-hour written notice requirement.[18]

**B. The Project Timeline**

If JAX had started the Schedule on September 29, 2021, the day after the Work Authorization was signed, the submittals[19] should have been submitted by October 5, 2021, the underground for roof drains should have been completed by October 12, 2021, the underground for the office areas should have been completed by October 25, 2021, and the overhead plumbing and roof drains should have been completed by January 12, 2022.

Around October 7, 2021, JAX mobilized on the Project. Based on that date, Submittals should have been submitted by October 26, 2021, the underground for roof drains should have been completed by November 2, 2021, the underground for the office areas should have been completed by November 15, 2021, and the overhead plumbing and roof drains should have been completed by February 2, 2022.

On October 21, 2021, JAX failed its first inspection, and the next day failed a re-inspection.[20] On November 18, 2021, JAX, while working on the underground

[17] *Id.* at ¶ 19a.
[18] *Id.* at ¶ 19c.
[19] Tr. at 26 (Submittals are product data on materials which a contractor would install, that are provided from a supplier).
[20] Plaintiff's Ex. 28 at 2.

plumbing, backfilled a trench without proper compaction, which required it to remove the material and refill the trench.[21] Two days later, JAX had still not refilled the trench correctly and had only two people onsite working.[22] JAX continued to have issues with the underground plumbing, which resulted in both the concrete and structural steel contractors threatening to send their crews home due to delays.[23]

On December 14, 2021, as a result of mistakes and delays, Catamount provided JAX a formal 24-hour notice (the "Notice").[24] The Notice provided JAX failed to 1) provide sufficient on-site supervision, 2) provide sufficient manpower, 3) failed six inspections which caused delays to the Schedule, and 4) provide submittals in a timely manner.[25] Thereafter, Catamount required that JAX submit a plan with corrective measures within 24 hours.[26]

Following the Notice, JAX continued to have issues with the underground plumbing, including a sanitary line that JAX should have started on or before December 22, 2021, and by January 9, 2022, it was not inspected or backfilled.[27] In March 2022, a concrete slab inspection failed due to JAX's work, which put the concrete contractor behind and Catamount warned JAX that back charges from the concrete contractor were likely to occur because of delays caused by JAX.[28]

---

[21] Plaintiff's Ex. 25 at 11-12.
[22] *Id.* at 10.
[23] *Id.* at 6.
[24] Plaintiff's Ex. 27 at 2-3.
[25] *Id.* at 2.
[26] *Id.* at 1.
[27] Plaintiff's Ex. 30 at 2.
[28] Plaintiff's Ex. 38 at 2.

On March 21, 2022, Catamount rejected JAX's March pay application (the "March Application") for multiple reasons including JAX billed at 100% for office underground work that had not been started, JAX billed high bay rentals at 91% although a majority was incomplete, daily reports were not provided, and back charges needed to be billed for.[29] On March 22, 2022, JAX considered the rejection of the March Application a breach of contract and stated it would demobilize unless Catamount stopped all back charges and provided $300,000.00 in additional funding.[30]

On March 25, 2022, Catamount proposed a plan where it would absorb previous back charges, as long as JAX met or exceeded new Schedule durations, and if they failed to do so all known back charges and costs incurred would be JAX's responsibility.[31] Further, Catamount's proposed plan required JAX to keep Duran Plumbing on as supervision, JAX participate in on-site mandatory weekly subcontractor meetings, JAX participate in mandatory weekly site safety meetings, and JAX revise and resubmit the March Application with line items removed that have not started.[32] On March 31, 2022, JAX rejected Catamount's proposed plan and indicated it would continue only if Catamount imposed no past or future back charges, provide payment of retainage in the amount of $168,728.00, labor, subcontractors, and materials be billed at actual cost or invoice plus 5%, and all previous pay applications

---

[29] Plaintiff's Ex. 6 at 2.
[30] *Id.* at 1.
[31] Plaintiff's Ex. 5 at 1-2.
[32] *Id.* at 2.

up to the March Application be paid in full.[33]

On April 8, 2022, Catamount rejected JAX's additional demands and reminded JAX that the Project Subcontract was enforceable, and legal liabilities would result from JAX's failure to complete the scope of the Work Authorization or reach a resolution.[34] The same day, JAX, unsatisfied with the terms of continuing the Project, notified Catamount that it would demobilize immediately from the Project.[35]

On April 14, 2022, Catamount sent a second 24-Hour notice (the "Second Notice") and termination letter (the "Termination Letter") to JAX, providing formal notice that it was terminating the Project Subcontract on April 16, 2022, due to JAX's nonperformance and abandonment of the Project.[36] Based on the foregoing, and as discussed in more detail below, the Court finds JAX breached the Project Subcontract.

**C. The Real Property Sale**

On June 12, 2023, a corporate warranty deed (the "Deed") was executed by JAX and XAJ Holdings, Inc. ("XAJ"), on behalf of JAX for the sale (the "Sale") of the property located at 901 7th Avenue, Jacksonville Beach, Florida, 32250 (the "Property") to Natural Life Collections, Inc. for $7,000,000.00.[37] Lowery, as Director and Chief Executive Officer, was the sole signatory of the Deed on behalf of both JAX and XAJ.[38] After closing costs and satisfaction of secured obligations, the net sale

---

[33] Plaintiff's Ex. 7 at 2.
[34] *Id.* at 1.
[35] Plaintiff's Ex. 8 at 1.
[36] Plaintiff's Ex. 10.
[37] Plaintiff's Ex. 51; Defendants' Ex. 7.
[38] Plaintiff's Ex. 51 at 2; Defendants' Ex. 7 at 3.

proceeds were $866,444.32 (the "Property Sale Proceeds").[39] On June 14, 2023, the Property Sale Proceeds was wired to JAX's Morgan Stanley Account ending in 5092 (the "JAX MS 5092 Account").[40]

**D. JAX 2023 Pre Property Sale Wire Transfers**[41]

Catamount called into question the following transfers from the JAX MS 5092 Account to accounts associated with Defendants: LDDV, Inc. ("LDDV"), the company owned by Samantha Lowery ("Mrs. Lowery"), Lowery's wife; the Lowery Revocable Trust (the "Lowery Trust"); and American Express ("AMEX"):[42]

- On January 17, 2023, $150,000.00 was wired (the "January 17 Transfer") from the JAX MS 5092 Account to the Lowery Trust Truist account ending in 0820 (the "Trust Truist Account").[43]

- On February 6, 2023, $324,301.00, $151,000.00, and $68,000.00 was wired (the "February 6 Transfers") from the JAX MS 5092 Account to the 3010 AMEX.[44]

- On February 7, 2023, $100,000.00 was wired (the "February 7 Transfer") from the JAX MS 5092 Account to the Trust Truist Account.[45]

---

[39] Plaintiff's Ex. 51 at 4-6; Defendants' Ex. 7 at 5-7.
[40] Plaintiff's Ex. 45 at 22, 99; Defendants' Ex. 2 at 23, 92.
[41] All wire transfers prior to the Sale in this section will collectively be referred to as the "Pre-Sale Transfers."
[42] Plaintiff's Ex. 45. For the purpose of these Findings of Fact and Conclusions of Law the reference to JAX MS 5092 Account is the same as Unterholzner's reference to a Morgan Stanley Account ending in 6775. There were additional transfers that were not included in Unterholzners analysis.
[43] Plaintiff's Ex. 44 at 30; Plaintiff's Ex. 45 at 100; Defendants' Ex. 2 at 93.
[44] Plaintiff's Ex. 44 at 30; Plaintiff's Ex. 45 at 100; Defendants' Ex. 2 at 93. The evidence related to the 3010 AMEX, is lacking. The record before this Court does not identify the name of the owner of the 3010 AMEX and no monthly statements were presented at Trial.
[45] Plaintiff's Ex. 44 at 30; Plaintiff's Ex. 45 at 100; Defendants' Ex. 2 at 93.

- On April 6, 2023, an internal transfer (the "April 6 Transfer") of $800,000.00 from the JAX MS 5092 Account was made to the Lowery Trust Morgan Stanley account ending in 3092 (the "Trust MS 3092 Account").[46]

## E. Post Property Sale Transfers[47]

After the Sale, several transfers were made from the JAX MS 5092 account to LDDV, AMEX, and JAX HVAC, Inc. ("JAX HVAC") including:

- On June 23, 2023, $187,478.38 was wired (the "June 23 Payment") from the JAX MS 5092 Account to the LDDV corporate American Express account ending in 2008 (the "LDDV AMEX").[48]

- On June 26, 2023, $55,496.41 was wired from the JAX MS 5092 Account to Lowery's personal American Express ending in 2005 (the "Lowery 2005 AMEX").[49]

- On July 13, 2023, $85,853.52 was wired from the JAX MS 5092 Account to the Lowery 2005 AMEX.[50]

- On August 25, 2023, $6,000.00 was wired from the JAX HVAC Truist Account ending in 3290 (the "JAX HVAC 3290 Account") to the Lowery 2005 AMEX.[51]

- On September 25, 2023, $40,946.67 was wired from the JAX MS 5092 Account to the Lowery 2005 AMEX.[52]

---

[46] Plaintiff's Ex. 44 at 30; Plaintiff's Ex. 45 at 100; Defendants' Ex. 2 at 93.
[47] All wire transfers in this section will collectively be referred to as the "Post-Sale Transfers."
[48] Plaintiff's Ex. 44 at 34, 78; Plaintiff's Ex. 45 at 101; Defendants' Ex. 2 at 94; Defendants' Ex. 5 at 8; Defendants' Ex. 8.
[49] Plaintiff's Ex. 44 at 33, 78; Plaintiff's Ex. 45 at 101; Plaintiff's Ex. 46 at 17; Defendants' Ex. 2 at 94; Defendants' Ex. 3 at 10; Defendants' Ex. 8.
[50] Plaintiff's Ex. 44 at 33, 72; Plaintiff's Ex. 45 at 101; Plaintiff's Ex. 46 at 23; Defendants' Ex. 2 at 94; Defendants' Ex. 3 at 16; Defendants' Ex. 8.
[51] Plaintiff's Ex. 44 at 33, 73; Plaintiff's Ex. 46 at 29; Defendants' Ex. 3 at 22. JAX HVAC is a related subsidiary to JAX and XAJ although is not a party in this Proceeding. The JAX HVAC 3290 Account statements were not provided as evidence in this Proceeding.
[52] Plaintiff's Ex. 44 at 33, 72; Plaintiff's Ex. 45 at 44, 101; Plaintiff's Ex. 46 at 35; Defendants' Ex. 2 at 94; Defendants' Ex. 3 at 28; Defendants' Ex. 8.

- On October 2, 2023, $54,182.62 was wired from the JAX MS 5092 Account to the LDDV AMEX.[53]

- On October 27, 2023, $25,000.00 was wired from the JAX HVAC 3290 Account to the Lowery 2005 AMEX.[54]

- On November 21, 2023, $77,390.58 was wired from the JAX MS 5092 Account to the Lowery 2005 AMEX.[55]

- On December 13, 2023, $100,000.00 was wired from the JAX MS 5092 Account to the Lowery 2005 AMEX.[56]

### F. The JAX and XAJ Bankruptcy Cases

On October 2, 2025, JAX filed a voluntary Chapter 7 bankruptcy case No. 3:25-bk-03561-JAB (the "JAX Bankruptcy").[57] JAX scheduled $0.00 in secured claims, $16,664.59 in priority unsecured claims, and $8,508,841.40 in non-priority unsecured claims. [58] In JAX's Schedule A/B, Catamount is listed as a cause of action with the nature of the claim listed as "claim for construction damages" in an unknown amount.[59] In JAX's Schedule E/F, Catamount is listed as an unsecured creditor in the amount of $2,660,000.00 that is not disputed, contingent, or unliquidated.[60] Catamount did not file a claim in the JAX Bankruptcy. On December 3, 2025, the

---

[53] Plaintiff's Ex. 44 at 33, 78; Plaintiff's Ex. 45 at 64, 101; Defendants' Ex. 2 at 94; Defendants' Ex. 5 at 34; Defendants' Ex. 8.
[54] Plaintiff's Ex. 44 at 33, 73; Defendants' Ex. 3 at 34.
[55] Plaintiff's Ex. 44 at 33, 72; Plaintiff's Ex. 45 at 80, 101; Defendants' Ex. 2 at 94; Defendants' Ex. 3 at 40; Defendants' Ex. 8.
[56] Plaintiff's Ex. 44 at 33, 72; Plaintiff's Ex. 45 at 98, 101; Defendants' Ex. 2 at 94; Defendants' Ex. 3 at 48; Defendants' Ex. 8.
[57] JAX Bankruptcy, Doc. 1.
[58] *Id.* at 33.
[59] *Id.* at 12.
[60] *Id.* at 23.

trustee filed a Chapter 7 Trustee's Report of No Distribution. On January 14, 2026, the JAX Bankruptcy was closed.

On October 5, 2025, XAJ filed a Chapter 7 bankruptcy case, Case No. 3:25-bk-03587-JAB (the "XAJ Bankruptcy").[61] XAJ had a total of $0.00 in secured claims, $16,664.59 in priority unsecured claims, and $8,508,841.40 in non-priority unsecured claims.[62] In Schedule E/F, Catamount is listed as an unsecured creditor in the amount of $2,660,000.00 that is undisputed, contingent, or unliquidated.[63] In the Statement of Financial Affairs, XAJ listed a pending lawsuit in the United States District Court for the Middle District of Florida, Case No. 3:24-cv-00265-MMH-PDB (the "District Court Case") between Catamount and Debtors, with the nature of the case listed as "collection."[64] The priority and non-priority unsecured claims in the XAJ Bankruptcy and JAX Bankruptcy were identical, and there were a number of claims for which the listed amount was unknown.[65] There were no claims filed in the XAJ Bankruptcy. On December 3, 2025, the trustee filed a Chapter 7 Trustee's Report of No Distribution. On January 15, 2026, the XAJ Bankruptcy was closed.

**G. The District Court Case**

The parties in the District Court Case are Plaintiff, Catamount and Defendants JAX, Lowery, Mrs. Lowery, and XAJ. On March 14, 2024, the District Court Case

---

[61] XAJ Bankruptcy, Doc. 1.
[62] *Id.* at 37.
[63] *Id.* at 24.
[64] *Id.* at 40.
[65] *Id.*; JAX Bankruptcy, Doc. 1.

complaint was filed,[66] and on April 2, 2025 it was amended (the "Amended Complaint").[67] The Amended Complaint was virtually identical to the district court complaint with the counts being I) Breach of Contract (against JAX), II) Fraudulent Transfer under Fla. Stat. § 726.105(1) (against JAX, Lowery, Mrs. Lowery, and XAJ), III) Fraudulent Transfer under Fla. Stat. § 726.106(1) (against JAX, Lowery, Mrs. Lowery, and XAJ), and IV) Piercing the Corporate Veil (against JAX and Lowery). Catamount was provided with the opportunity to return to the District Court to prosecute this matter earlier in this Proceeding and elected to continue with this Proceeding instead of the District Court Case.

**H. The Lowery Bankruptcy Case**

On July 28, 2025, Lowery filed the underlying Chapter 11 bankruptcy case, Case No. 3:25-bk-02562-JAB (the "Lowery Bankruptcy") and listed Catamount as an unsecured creditor in an unknown amount.[68] Lowery scheduled a total of $7,000,108.00 in secured claims,[69] $400,000.00 in priority unsecured claims, and $893,440.50 in non-priority unsecured claims.[70] There were a total of 33 claims filed totaling $19,273,028.80. Catamount did not file a claim in the Lowery Bankruptcy. On October 31, 2025, Lowery filed his Chapter 11 Plan of Reorganization (the

---

[66] District Court Case, Doc. 1.
[67] District Court Case, Doc. 40.
[68] Lowery Bankruptcy, Doc. 1.
[69] *Id.* at 29.
[70] *Id.* at 55.

"Plan").[71] On January 14, 2026, the Court entered an Order Confirming the Plan.[72] On March 3, 2026, the Court entered an Order of Discharge.[73]

**I. This Adversary Proceeding**

On October 9, 2025, Catamount filed the Complaint.[74] On October 20, 2025, Defendants filed a Motion to Dismiss Adversary Proceeding with Prejudice,[75] which the Court denied on December 19, 2025.[76] On February 12, 2026, the Court entered the Order Scheduling Trial, including deadlines for pre-trial filings, with a deadline for the disclosure of expert witnesses as 28 days before Trial.[77] On March 18, 2026, Defendants timely filed a Disclosure of Expert Witness Names and Contact Information.[78] On April 24, 2026, Catamount filed a Motion for Enlargement of Time, Continuance of Trial, and Extension of Case Deadlines,[79] which was denied by the Court during the April 28, 2026 hearing, and by an Order on April 29, 2026.[80] On April 30, 2026, Catamount filed a Motion for Leave to File Out of Time Expert Disclosure (the "Motion for Leave") for the inclusion of the Expert Report written by Lisl Unterholzner ("Unterholzner"),[81] and on May 11, 2026, the Court entered an

[71] Lowery Bankruptcy, Doc. 94.
[72] Lowery Bankruptcy, Doc. 178. Under the Plan, the unsecured class was to receive a $50,000.00 lump sum payment upon the effective date of the Plan.
[73] Lowery Bankruptcy, Doc. 184.
[74] Adv. Doc. 1.
[75] Adv. Doc. 5.
[76] Adv. Doc. 16.
[77] Adv. Doc. 21.
[78] Adv. Doc. 25.
[79] Adv. Doc. 28.
[80] Adv. Doc. 31.
[81] Adv. Doc. 32.

Order Granting the Motion for Leave, requiring Catamount's expert disclosure and expert report to be filed by May 21, 2026.[82] On May 18, 2026, Catamount filed its Amended Rule 26(A)(3) Pretrial Disclosures, including the names and contact information for expert witnesses.[83] On May 21, 2026, Catamount filed its Pre-Trial Brief[84] and Notice of Filing Expert Witness Report for Unterholzner.[85] On May 22, 2026, Defendants filed a Motion in Limine Regarding Trial Evidence (the "Motion in Limine").[86] On May 28, 2026, Defendants filed their Pre-Trial Memorandum,[87] and Catamount filed the Joint Stipulation of Undisputed Facts and Exhibits.[88] On May 28, 2026, Catamount filed proposed exhibits 1-25, 27-40, 43-45, 51, and 53-54,[89] and on June 1, 2026, it filed additional proposed exhibits 46-50 and 52 ("Plaintiff's Exhibits").[90] On May 29, 2026, Defendants filed proposed exhibits 1-8 ("Defendants' Exhibits").[91] On June 3, 2026, Catamount filed a Motion to Amend Pleadings Based on Trial Objections (the "Motion to Amend").[92]

---

[82] Adv. Doc. 41.
[83] Adv. Doc. 44.
[84] Adv. Doc. 46.
[85] Adv. Doc. 47
[86] Adv. Doc. 48.
[87] Adv. Doc. 49.
[88] Adv. Doc. 50. On June 1, 2026, Catamount filed an Amended Joint Stipulation of Undisputed Facts and Exhibits (Adv. Doc. 55).
[89] Adv. Doc. 51.
[90] Adv. Doc. 56.
[91] Adv. Doc. 53.
[92] Adv. Doc. 57.

**a. The Trial**

The Trial on all counts of the Complaint took place on June 4, 2026. The Court admitted Plaintiff's Exhibits and Defendants' Exhibits into evidence without objection. [93] Notably, the Plaintiff's and Defendants' Exhibits do not include the transcript of any depositions and do not include complete records of all bank and credit card statements. Catamount and Defendants both called witnesses. Catamount asserted its damages at the time of the Trial are $2,841,177.00.[94]

**i. Testimony of Randy Metz**

Randy Metz ("Metz"), lead Catamount superintendent on the Project, testified credibly as to his on-site experiences, communications with JAX, JAX caused delays, and JAX breaches of its agreements with Catamount. Metz's testimony included:

- When JAX was terminated six months after the date the submittals were due according to the Schedule, the submittals had not been received. If submittals are delayed, the scope of work cannot be started.[95]

- The Schedule required JAX to complete the underground plumbing within 30 days, but JAX did not receive the permit required to complete the underground plumbing until three weeks after it mobilized. When JAX demobilized six months later it was still working on the underground plumbing.[96] At the time JAX mobilized it started excavations, but no inspections could be completed until a permit was received;[97]

- He did not believe JAX had an on-site supervisor. He stated that someone by the name of Reggie, who attended some of the required weekly subcontractor meetings, stated he was a temporary [JAX employee].

[93] Plaintiff's Exs. 26, 41, and 42 were omitted.
[94] Plaintiff's Ex. 13.
[95] Tr. at 67.
[96] *Id.* at 27-28.
[97] *Id.* at 56.

When Metz contacted JAX, he was told that Reggie was the JAX representative;[98]

- JAX was a front-loaded trade, which meant JAX's work was required to be completed before successor trades could complete their work, and JAX's failure to perform caused delays;[99]

- JAX had failed to adhere to the Master Subcontract provision for scope of work at the time Catamount declined to pay JAX March Application and JAX sought payment for incomplete work;[100]

- The March Application billed at 100% for work that had not been started, and billed at 91% for work that had been started but was not close to being completed;[101]

- During contractor meetings a look-ahead schedule is put together to lay out the scope of work to be completed within a seven day period, subcontractors make representations about what they will achieve, and minutes are generated.[102] JAX did not attend most of the subcontractor meetings, including meetings after Metz called about Reggie, who JAX stated was its representative.[103] For a two week period an individual attended the mandatory weekly meetings on behalf of JAX;[104]

- JAX provided insufficient, unskilled, and unsupervised workers and as a result fell behind schedule and impacted other contractors;[105]

- JAX did not make any claims to Catamount regarding additional costs, extra work, extensions of time, or other issues as provided in the Master Subcontract;[106]

[98] *Id.* at 28.
[99] *Id.* at 30.
[100] *Id.* at 32. JAX was allowed to bill for actual work in place and for stored materials, but not for work that had not been started or been completed.
[101] *Id.* at 76.
[102] *Id.* at 34-36.
[103] *Id.* at 35.
[104] *Id.* at 63.
[105] *Id.* at 36-37.
[106] *Id.* at 40.

- Paragraph 18 of the Master Subcontract titled Delays and Disruptions provides the basis for Catamount's claim for damages;[107]

- Failing an inspection can result in a four-to-five-day delay;[108]

- JAX failed to properly fill and compress the underground, which led to lost time in excavating and required restarting the process;[109]

- In January 2022, JAX had not properly completed the underground portion of the Project;[110]

- In the event someone was required to complete JAX's work, Catamount could be compensated for the additional cost;[111]

- The Notice issued December 14, 2021, identified issues including unqualified workers and the use of temporary labor, and required JAX to submit a cure plan.[112] JAX did not refute this Notice;[113]

- JAX failed to satisfy the conditions to resolve the default from the Notice by March 2022.[114] JAX brought in Duran Plumbing to supplement its crew, but the situation did not improve;[115]

- Catamount did not receive any delay reimbursements from the owner of the Project related to JAX's work;[116]

- Catamount did not agree to amend the Master Subcontract with JAX;[117]

- JAX was still working on the underground for the roof drains after the duration provided in the Schedule. The consequence of missing a deadline on the Schedule is that if other contractors had not mobilized, they would need to rework their forces, and if they are onsite, such as the

[107] *Id.* at 40-41.
[108] *Id.* at 43.
[109] *Id.* at 44.
[110] *Id.* at 69.
[111] *Id.* at 47.
[112] *Id.* at 49.
[113] *Id.* at 79.
[114] *Id.*
[115] *Id.* at 49.
[116] *Id.* at 50.
[117] *Id.* at 51.

concrete contractor on the Project, the concrete contractor is paying lodging and per diems, when its crews are not working;[118]

- Prior to sending the Notice, Catamount sent notices to JAX regarding an insufficient number of workers, incorrectly completed work, and failing to maintain the Schedule;[119]

- A December 3, 2021, email stated the underground plumbing was not complete causing delays to other contractors, and concrete and structural steel contractors were threatening to remove their crews;[120]

- Had JAX performed timely, in December 2021, the framing of the building would have occurred, and the building would have gone vertical;[121]

- By December 2021, JAX had failed eight on-site inspections resulting in duplication of work, rescheduled inspections, and additional lost time;[122]

- In December 2021, Kent, the concrete contractor, submitted a claim to Catamount for delays and lost time;[123]

- JAX failed to provide sufficient on-site supervision, manpower, and to abide by the Schedule at the time the Notice was issued.[124]

- Through the January 2022 pay application, Catamount paid JAX almost $1,200,000.00;[125]

- On October 29, 2021, JAX should have been 100% complete with the office underground plumbing and it was not complete as of March 21, 2022;[126]

---

[118] *Id.* at 54-55.
[119] *Id.* at 57-58.
[120] *Id.* at 58-60.
[121] *Id.* at 61.
[122] *Id.* at 62.
[123] *Id.* at 62-63.
[124] *Id.* at 64-65.
[125] *Id.* at 77-78.
[126] *Id.* at 77.

- On March 22, 2022, JAX emailed Catamount refuting any back charges, and indicated it was demobilizing the Project. [127] JAX also stated it expected to be paid for all work, and Catamount could finish the job with another contractor at its own cost;[128]

- To stay on the Project, JAX required Catamount to waive all back charges,[129] and demanded cost plus an additional 5% for billing;[130]

- If Catamount had agreed to continue with no past or future back charges, the completion of the underground work would have taken another 6 months and left Catamount with no remedy;[131]

- On April 8, 2022, JAX emailed Catamount indicating it would be leaving the Project. JAX demobilizing was a further breach of the Project Subcontract;[132]

- Catamount is seeking $2,841,177.00 in damages, which includes the actual costs Catamount incurred to complete the Project.[133]

**ii. Testimony of Lisl Unterholzner**

Catamount retained Unterholzner, a certified CPA, who was qualified to testify as an expert witness regarding the alleged fraudulent transfers. On May 21, 2026, Catamount filed Unterholzner's Expert Report (the "Unterholzner Report") in which she reviewed financial records to identify possible transfers made to insiders for which JAX did not receive reasonably equivalent value.[134] The Unterholzner Report provided:

---

[127] *Id.* at 78.
[128] *Id.* at 80.
[129] *Id.* at 80, 84.
[130] *Id.* at 84-85.
[131] *Id.* at 80.
[132] *Id.* at 87
[133] *Id.* at 93-94.
[134] Plaintiff's Ex. 44.

- Unterholzner was not provided with a complete set of financial records and therefore could not reach definitive conclusions;[135]

- Based on the available documentation, Unterholzner could not determine whether the Pre-Sale Transfers were made for a reasonably equivalent value;[136]

- For the Lowery 2005 AMEX, Unterholzner identified $436,761.47 in business expenses,[137] $190,548.27 in personal expenses,[138] and $165,191.77 in unknown expenses between March 29 and December 28, 2023.[139]

- JAX transferred $553,357.28, JAX HVAC transferred $31,000.00, and unknown accounts transferred $260,115.21 to the Lowery 2005 AMEX between March 29 and December 28, 2023;[140]

- Unterholzner classified $34,551.00 in charges made to "DAILY'S PLACE/BOLD EVENTS" (the "Daily's Place Charges"),[141] $23,747.50 in charges to "TM-JACKSONVILLE JAGUARS INH TICKET AGENCY" (the "Jaguars Charges"),[142] and $29,986.07 in charges to "IN * ARENA STAFFING ONTARIO CA" (the "Arena Charge") [143] as personal expenses;

- Unterholzner classified $36,250.00 in charges to "IN*POSTILLION TAX CONSULTANTS, LLC" (the "Postillion Charges"),[144] $27,379.99 in charges to "AT&T PAYMENT" (the "AT&T Charge"),[145] and $61,036.78 in charges to "BURR & FORMAN LLP – BIRMINGHAM" (the "Burr & Forman Charges") [146] as unknown or personal expenses;

---

[135] *Id*. at 10.
[136] *Id.*
[137] *Id.* at 33, 55-57.
[138] *Id.* at 33, 61-71.
[139] *Id.* at 33, 58-60.
[140] *Id.* at 33, 72.
[141] *Id.* at 61, 63-69, 71.
[142] *Id.* at 61-68
[143] *Id.* at 67.
[144] *Id.* at 58-59.
[145] *Id.* at 58.
[146] *Id.* at 43, 59. On December 12, 2023, Unterholzner marked $41,539.41 in charges to "BURR & FORMAN LLP – BIRMINGHAM" as business expenses while classifying the other charges differently.

- For JAX's corporate AMEX account ending in 7006 (the "JAX 7006 AMEX"), Unterholzner identified $17,782.81 in business spending,[147] $3,080.97 in unknown spending,[148] and $581.06 in personal spending between October 22, 2023 and December 12, 2023;[149]

- The JAX 7006 AMEX received payments of $11,096.00 from JAX[150] and $7,000.00 from an unknown source between October 22, 2023 and December 12, 2023;[151]

- The JAX AMEX ending in 1003 (the "JAX 1003 AMEX") had $1,146,993.45 in business spending[152] and $33,855.00 in personal spending between October 22, 2023, and December 22, 2023;[153]

- The JAX 1003 AMEX received $958,367.13 from JAX,[154] $227,594.24 from JAX HVAC,[155] and $156,008.07 from an unknown source between October 22, 2023, and December 22, 2023;[156]

- The LDDV AMEX had $106,246.92 in business spending[157] and $75,256.32 in personal spending[158] between April 28 and October 27, 2023; and

- The LDDV AMEX received $241,661.00 in payments from JAX[159] and $155,998.49 in payments from an unknown source between April 28 and October 27, 2023.[160]

---

[147] *Id.* at 32, 50.
[148] *Id.* at 32, 51.
[149] *Id.* at 32, 52.
[150] *Id.* at 32, 53.
[151] *Id.* at 32, 54.
[152] *Id.* at 31, 36-44.
[153] *Id.* at 31, 45-46.
[154] *Id.* at 31, 47.
[155] *Id.* at 31, 48.
[156] *Id.* at 31, 49.
[157] *Id.* at 34, 75.
[158] *Id.* at 34, 76-77.
[159] *Id.* at 34, 78.
[160] *Id.* at 34, 79.

Unterholzner testified that:

- She reviewed financial records, accounts, and tax returns, to identify where transfers had been made to insiders;[161]

- To the extent records were available to her, she attempted to determine whether transfers were evidenced by value received by JAX;[162]

- On the XAJ 2023 and 2024 consolidated tax returns, XAJ is listed as owning 100% of JAX and JAX HVAC, and Lowery owns 100% of XAJ. If Lowery owns 100% of XAJ, he owns 100% of JAX and JAX HVAC;[163]

- Missing from her analysis were specific details of how the costs incurred on the AMEX accounts were directly related to jobs performed by JAX or JAX HVAC. Moreover, a large volume of records is missing for 2022, and additional transfers were not analyzed because she did not have the records.[164]

- Accounts payable documents for a construction company are typically needed to justify their expenses, and she did not have such documents;[165]

- In June 2023, the Property Sale Proceeds were disbursed into the JAX MS 5092 Account;[166]

- On June 27, 2023, $187,478.38 was transferred from the JAX MS 5092 Account to the LDDV AMEX. She confirmed this by matching the JAX MS 5092 account statements and the LDDV AMEX statements and was unable to conclude whether JAX received any value in exchange;[167]

- On October 27, 2023, $54,182.62 was transferred from the JAX MS 5092 Account to the LDDV AMEX and she did not find documents that indicate JAX received value in exchange;[168]

---

[161] Tr. at 114.
[162] *Id.* at 114-115.
[163] *Id.* at 116.
[164] *Id.* at 118-120.
[165] *Id.* at 122.
[166] *Id.* at 126.
[167] *Id.* at 127-128.
[168] *Id.* at 130.

- Between June 27, 2023 and October 27, 2023, two charges totaling $105,946.92 from "THE RAE CORPORATION AC AND HEATING EQUIP"[169] could have been offset as business expenses;[170]

- There were no corresponding statements for the January 17 and February 6 Transfers;[171]

- There was accounting for the February 7 and April 6 Transfers;[172]

- For the January 17, February 7, and April 16 transfers she was unable to determine whether JAX received any value in exchange;[173]

- For February 6 Transfers, she did not have a backup for the charges, and there were no business records indicating a business justification for JAX making the payments;[174]

- She could not identify value received by JAX for the $54,182.62 payment to the LDDV AMEX in October of 2023;[175]

- Expenses paid from business accounts are generally presumed business-related unless they appear clearly personal in nature;[176]

- For personal accounts, she treated charges as business-related only when they were consistent with charges that appeared on the corporate account;[177]

- Because the Lowery 2005 AMEX was a personal card, it was more difficult to presume its charges were business expenses; she classified as business only charges consistent with charges used in this type of construction trade;[178]

---

[169] Plaintiff Ex. 44 at 13.
[170] Tr. at 150.
[171] *Id.* at 131.
[172] *Id.* at 131-132.
[173] *Id.*
[174] *Id.* at 133. Unterholzner did not account for the February 6, 2023 $150,000.00 transfer in her analysis although it was on the same date and to the same account as the other February 6 Transfers.
[175] *Id.* at 130.
[176] *Id.* at 135.
[177] *Id.*
[178] *Id.*

- Based on the XAJ 2023 consolidated tax return (the "2023 Tax Return") there was a decline in sales from $44,000,000.00 in 2022 to $10,000,000.00 in 2023;[179]

- The 2023 Tax Return shows a loan from a shareholder for $352,000.00 (the "2023 Shareholder Loan") and repayment for which no further documentation was provided. Lowery was the only shareholder of XAJ, suggesting that he received $352,000.00;[180]

- The XAJ 2024 consolidated tax return (the "2024 Tax Return") shows a $604,382.00 shareholder loan (the "2024 Shareholder Loan") by JAX, in which there was no evidence of value received by JAX in exchange for the loan;[181]

- JAX had negative equity at both the beginning and end of 2022 and in her opinion restoring the transfers from April 2023-December 2023 would have resulted in positive equity.[182] The negative equity position from the 2023 Tax Return continued in the 2024 Tax Return;[183]

- She did not have an opinion on the validity, or the truthfulness of the 2021 financials provided by JAX to Catamount;[184]

- As for the Post-Sale Transfers, on the Lowery 2005 AMEX, she provided $390,000.00 in payments from JAX and JAX HVAC, $337,000.00 in business spending, and $53,000.00 as the difference between the payments by the business and the expenses that appear to be business expenses;[185]

- She classified the Arena Charge as a personal charge, due to the Lowery 2005 AMEX being a personal card, and she did not have the records to show Arena Staffing was an entity which was regularly paid or a business record to show Arena Staffing was being used for a job;[186] and

---

[179] *Id.* at 141.
[180] *Id.* at 143.
[181] *Id.* at 144. Collectively the 2023 and 2024 Shareholder Loans will be referred to as the "Shareholder Loans."
[182] *Id.* at 142-143.
[183] *Id.* at 145.
[184] *Id.* at 147.
[185] *Id.* at 150-151.
[186] *Id.* at 152.

- She categorized the Daily's Place Charges and Jaguars Charges as personal expenses, upon her belief that they were charges on a personal card and did not discuss the charges with Lowery.[187]

### iii. Testimony of Daniel Zorrilla

On May 18, 2026, Daniel Zorrilla issued a written report.[188] Zorrilla, President of Oxley, Brannon & Zorrilla Consultants, was qualified as an expert on delay analysis and contract administration.[189] Zorrilla was to testify on behalf of Defendants specifically about his opinions on the Schedule, delays, and compliance with the Master Subcontract. Catamount objected to Zorrilla testifying as to contract administration, and the Court allowed the testimony with a standing objection by Catamount.

Zorrilla testified that:

- He reviewed the Complaint and project records and found no evidence supporting the allegations;[190]

- Catamount wrongfully rejected JAX's March Application because the stated grounds did not justify a full rejection under the Project Subcontract;[191]

- Catamount could withhold payment for defective work or for work completed by a replacement contractor under the Project Contract;[192]

- Catamount's denial of JAX March Application was unsupported, and the Project Subcontract and industry standards did not allow for the rejection, but he admitted that he had not seen the March Application;[193]

---

[187] *Id.* at 152-153.
[188] Defendants' Ex. 1.
[189] *Id.*
[190] Tr. at 168.
[191] *Id.* at 169.
[192] *Id.*
[193] *Id.* at 170.

- The Master Subcontract specifically stated "time is of the essence" as for the overall schedule of the Project;[194]

- The critical path consists of scheduled activities necessary to complete the Project on time;[195]

- A subcontractor delay affects the overall Project only if it impacts the critical path and extends Catamount's completion time. He indicated that the critical path could shift, but as long as the delay itself does not require Catamount to be out there a day longer there is no delay to the overall project;[196]

- He agreed with the Court that untimely submitting submittals, having to dig up trenches twice, and late work could constitute a breach of the Project Subcontract. However, if Catamount was not on the Project longer than the Project Schedule, it did not suffer damages or incur delay damages;[197]

- Catamount could potentially recover documented acceleration or work around costs as back charges but could not obtain delay costs, absent proof that JAX delayed the overall Project completion;[198]

- JAX was one day late on concrete paving and six days late on low-bay roofing when Catamount terminated JAX;[199]

- Catamount reported to the owner of the Project it was on time, while seeking 60 days of extended time damages from JAX and withholding the March Application;[200] and

- The Project Subcontract required no bond, imposed no personal liability on Lowery, and contained no pledge of collateral.[201]

---

[194] *Id.*
[195] *Id.* at 172.
[196] *Id.* at 173.
[197] *Id.* at 174-176
[198] *Id.* at 177.
[199] *Id.* at 178.
[200] *Id.* at 178.
[201] *Id.* at 179-80.

### iv. Testimony of Mark Albert Lowery

Lowery, as the former President of JAX and in his individual capacity, testified about his experiences with Catamount, his understanding of the events surrounding the completion of the Project, his knowledge regarding the transfers at issue, and generally as to the business's operations and financial struggles prior to the bankruptcy filings. Lowery testified:

- JAX bid the Project in April 2021 but was not awarded the Project until late September;[202]
- Prior to the Project, JAX had worked on four to six projects with Catamount;[203]
- In 2021, JAX managed about $30 million in work across multiple divisions;[204]
- JAX had a full mechanical HVAC license in 43 states under Lowery's name. In Texas, JAX had a business license, mechanical license, refrigeration license, and plumbing license;[205]
- In 2021, the construction industry was facing labor shortages, project delays, supply-chain disruptions, material cost increases, and post COVID instability;[206]
- Catamount asked JAX to purchase and store materials before the Project began by which Catamount would pay to mitigate cost escalation, but JAX declined to incur those costs before the award of the Project;[207]

[202] *Id.* at 194.
[203] *Id.* at 195-196.
[204] *Id.* at 201.
[205] *Id.* at 196.
[206] *Id*. at 195.
[207] *Id.*

- For the Project and prior projects with Catamount, JAX hired local workers in order to support both construction and post completion warranty work;[208]

- The City of El Paso required a specific plumbing license, which JAX did not obtain prior to the award of the Project, that ultimately led to a delay in the start of the Project. The process to obtain the plumbing license required hiring a subcontractor and took around 60 days from the award date;[209]

- JAX agreed to the Schedule although he believed that it allowed virtually no margin for delay;[210]

- Supply chain issues made obtaining submittals difficult, and mobilization by September 29, 2021 was nearly impossible. Catamount listed October 7, 2021 as the contract date on the first pay application;[211]

- He attended some of the required meetings with Catamount but did not refute that JAX was not in attendance for all of the meetings;[212]

- JAX made no delay claim before Catamount issued the Notice;[213]

- As a result of JAX's closing down its business, he could not obtain invoices, bank statements, and accounts payable records. Moreover, the network and software were also inaccessible. In addition, all relevant AMEX accounts were closed due to the Lowery Bankruptcy, resulting in delay and incomplete document production;[214]

- He authorized the January 17, February 7, and April 6 Transfers;[215]

- In 2023, Lowery sold one of the JAX corporate divisions for roughly $1.2 million (the "Subdivision Sale Proceeds"), which prompted the creation of XAJ. [216]

[208] *Id.*
[209] *Id.* at 196-197.
[210] *Id.* at 200.
[211] *Id.*
[212] *Id.* at 206.
[213] *Id.* at 243.
[214] *Id.* at 201.
[215] *Id.* at 252.
[216] *Id.* at 251.

- January 17 and February 7 Transfers were repayment for the Trust Truist Account paying for JAX business expenses.[217]

- In June 2023, outgoing wire transfers from the JAX MS 5092 Account to the JAX Truist Account ending in 3511 for $170,000.00 were put into a JAX operating account and used for labor and small materials;[218]

- JAX paid the LDDV AMEX because it was sometimes the only card with available credit for JAX business expenses. The June 23 Payment was likely to cover major purchases for a JAX project in Miami;[219]

- The Lowery 2005 AMEX received payments in the amount of $978,000.00, which exceeded the Property Sale Proceeds, but Lowery asserted the business expenses during that time far exceeded the Property Sale Proceeds;[220]

- The Lowery 2005 AMEX was used as a JAX business card, and charges such as the Daily's Place Charges, Jaguars Charges, and Arena Charge were marked as personal expenses rather than business expenses;[221]

- The Postillion, Burr & Forman, and AT&T Charges were miscategorized as unknown or personal expenses rather than business expenses;[222] and

- Lowery estimated $225,000.00 in charges were miscategorized: $146,000.00 was categorized as unknown and $78,000.00 was categorized as personal, when both charges should have been categorized as business expenses.[223]

**v. Post-Trial Briefs**

---

[217] *Id.* at 237.
[218] *Id.* at 228.
[219] *Id.* at 228-29.
[220] *Id.* at 231.
[221] *Id.* at. 232-233.
[222] *Id.* at 234-235.
[223] *Id.* at 237.

On July 10, 2026, the Parties filed their Post-Trial Briefs.[224] As to JAX, Catamount seeks a money judgment for breach of the Project Subcontract in the amount of $2,841,177.00 and a determination under the Florida Uniform Fraudulent Transfer Act ("FUFTA") that JAX's transfers of its assets to insiders are avoided to the extent necessary to satisfy Catamount's claim.[225] As to Lowery, Catamount seeks a money judgment under FUFTA in the amount of $2,791,650.00 along with a finding the debt is nondischargeable under 11 U.S.C. § 523.[226] Lastly, as to XAJ, Catamount seeks a declaration that the Post-Sale Transfers and Shareholder Loans are fraudulent as to Catamount and should be avoided.[227] In their Post-Trial Brief, Defendants assert: 1) Catamount failed to prove JAX breached the Project Subcontract; 2) Catamount was without justification to withhold the March 2022 Lowery pay application; 3) Catamount failed to prove the fraudulent transfer allegations in Counts II and III; and 4) the Count V claims under 11 U.S.C. § 523(a) are without merit.[228]

## **<u>Conclusions of Law</u>**

### I. <u>Count I: Breach of Contract</u>

The Master Subcontract provides that it shall be interpreted under the laws of the State of Kentucky.[229] Accordingly, the Court applies Kentucky law to Catamount's

---

[224] Adv. Doc. 65; Adv. Doc. 66.
[225] Adv. Doc. 65.
[226] *Id.*
[227] *Id.*
[228] Adv. Doc. 66.
[229] Plaintiff's Ex. 3 at ¶ 38. Plaintiff cites to Florida breach of contract law in its Post-Trial Brief. The Master Subcontract provides in the subsection titled Jurisdiction and Arbitration/Litigation that the Master Subcontract will be interpreted under the laws of the

claim that JAX breached the Project Subcontract. Under Kentucky law, a plaintiff asserting a breach of contract claim must establish, by a preponderance of the evidence,[230] the existence of a valid contract, a breach of that contract, and damages resulting from the breach.[231] A valid contract requires an offer, unequivocal acceptance, sufficiently definite material terms, and consideration.[232] In order to show a breach occurred, Catamount must show JAX violated a contractual obligation or did not perform in accordance with the Project Subcontract.[233] Damages must be proven with reasonable certainty and must generally place the injured party in the position it would have been in had the contract been performed.[234]

Here, Catamount offered JAX subcontract work on the Project, and JAX accepted by executing the Work Authorization, which contained the material terms and provided adequate consideration, and incorporated the Master Subcontract. The Court therefore finds that Catamount and JAX entered into a valid contract under Kentucky law.

The preponderance of the evidence establishes that JAX breached the Project Subcontract. The Master Subcontract required JAX to perform its work efficiently, maintain the Schedule, avoid delaying other trades, provide sufficient skilled workers,

---

State of Kentucky. The Court's ultimate finding of breach of contract by JAX under Count I of the Complaint would be the same if Florida law were applied.

[230] *Arete Ventures, Inc. v. Univ. of Ky.*, 619 S.W.3d 906, 911 (Ky. Ct. App. 2020).

[231] *Saner v. Cabinet for Health and Fam. Services*, 734 S.W.3d 778, 783 (Ky. App. 2026).

[232] *Univ. of Ky. v. Regard*, 670 S.W.3d 903, 912 (Ky. 2023) (citing *Britt v. Univ. of Louisville*, 628 S.W.3d 1, 5 (Ky. 2021)).

[233] *See Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 10 (Ky. Ct. App. 2009).

[234] *Ford Contracting, Inc. v. Ky. Transp. Cabinet*, 429 S.W.3d 397, 407 (Ky. Ct. App. 2014).

and attend weekly contractor meetings. As shown through the evidence, JAX failed to satisfy these requirements. Kentucky courts recognize that a subcontractor's delays of a construction project constitute a breach of contract.[235]

First, JAX fell behind the Schedule. Lowery testified that from the time of the award of the Project, it took around sixty days to obtain the licensing required to be able to complete plumbing work. The Schedule required that submittals were due seven days after the Work Authorization was executed, and Metz testified that JAX had not provided them at the time of termination six months later. The Schedule allotted 14 days for underground roof drains and 27 days for underground office work to be completed. Metz testified that neither was completed at the time of termination in March 2022.

Second, JAX's delays affected other trades. The Master Subcontract required JAX to properly man the Project to work efficiently, maintain the schedule, and avoid and prevent any delay or disruption to the progress of other trades. Metz testified JAX did not properly complete the underground plumbing, and as a result was still working on the underground plumbing after the duration provided in the Schedule. JAX was a front-loaded trade, and the consequences of missing a deadline on the Schedule required other contractors to rework their forces and incur fees such as per diems while waiting to mobilize. The Schedule directly provides that JAX's compliance with

[235] *See Wehr Constructors, Inc. v. Steel Fabricators, Inc.*, 769 S.W.2d 51, 55 (Ky. Ct. App. 1988) (the Court there found that the subcontractor breached the contract by delaying the construction project). If Florida law was applied to this analysis, the ultimate conclusions would remain the same.

deadlines was a requirement for other portions of the Project to be completed. The underground for the roof drains was the sequence ahead of slab pours, and overhead plumbing was the sequence ahead of mezzanine erection. Metz testified on December 5, 2021, that the underground plumbing was not complete, causing delays to the concrete and structural steel contractors. Metz testified by December 2021, the framing of the building should have been occurring, and the building would be going vertical. Rather, Catamount was waiting for JAX to complete the underground. Ultimately, due to the delays and lost time, the concrete contractor submitted a back charge claim to Catamount. The Court finds that the continued delays and effects of such delays were a breach of the Project Subcontract by JAX.

Third, JAX failed to provide sufficient labor and to adequately perform under the Project Subcontract. Kentucky courts have found that a contractor's termination of a subcontractor for working without a full crew and not working expeditiously is a valid default and constitutes a breach.[236] The Master Subcontract required JAX to provide enough properly skilled workers to efficiently complete the Project. Metz testified that JAX failed to provide sufficient on-site supervision and manpower, and at certain times, JAX had only two workers on site. Moreover, JAX's crew made multiple errors including failing inspections, backfilling a trench without proper compaction, and taking more than 19 days to refill one sanitary line. As such, the

---

[236] *See Apex Contracting, Inc. v. William Robinson Const. Co., Inc.*, 581 S.W.2d 573, 577 (Ky. 1979) (the Court found that the construction subcontractor defaulted through delays and defective work, including refusing to provide a full crew for work).

Court finds the insufficient labor and inadequate performance constituted an additional breach of the Project Subcontract.

Fourth, JAX failed to have a representative attend the mandatory weekly contractor meeting as required under the Work Authorization. Metz testified that JAX had an individual named Reggie attend some of the required weekly meetings, although Reggie stated he was only a temporary JAX employee, even though JAX represented to Metz that Reggie was its representative. In addition, Lowery testified that he attended several meetings but did not otherwise dispute that JAX failed to attend all required meetings. As such, the Court finds that JAX's failure to maintain attendance at the weekly contractor meetings constituted an additional breach of the Project Subcontract.

Thus, given JAX's delays, delays to other contractors, failure to provide sufficient workers, and failure to attend weekly contractor meetings, the Court finds that JAX breached the Project Subcontract.

In addition, the Court finds that Catamount acted in compliance with the Master Subcontract when terminating JAX on the Project. Catamount issued the Notice, which JAX did not dispute, followed by the Second Notice, which was not required, and the Termination Letter.

Kentucky courts have permitted recovery of contract damages established with reasonable certainty, including appropriate costs resulting from construction delays.[237]

---

[237] *See Ford Contracting,* 429 S.W.3d at 407; *see Louisville & Jefferson Cnty. Metro. Sewer Dist. v. T+C Contracting, Inc.*, 570 S.W.3d 551, 567 (Ky. 2018) (citing *Cnty. of Galveston v. Triple B*

Catamount incurred damages through back charges and additional Project costs attributable to JAX's delays. Those damages included back charges from the concrete contractor and other contractors due to JAX's delays and general condition costs charged to Catamount by other contractors, including equipment storage and lodging.

Additionally, the Master Subcontract required JAX to reimburse Catamount for delay and completion costs and provided that, if the cost to complete JAX's work exceeded the unpaid contract balance, JAX would pay the difference. Kentucky courts have permitted enforcement of contract provisions allowing a contractor to assess damages against a defaulting subcontractor to complete the work, provided the completion cost exceeds the original contract price.[238] Here, like in *Apex*, Catamount retained Duran Plumbing to complete JAX's work and informed JAX it would be charged for the completion costs. In its Post-Trial Brief, Catamount states the $2,841,177.00 in damages is computed under Section 19A of the Master Subcontract, the calculation includes completion costs and delay damages and credits the unpaid contract balance.[239]

Based on the foregoing, the Court finds there was a contract, the Project Subcontract, between Catamount and JAX, JAX breached the Project Subcontract,

---

*Services, LLP*, 498 S.W.3d 176, 181 (Tex. App. 2016) (the Court there found that delay "damages compensate the contracting party that is injured when a project takes longer than the construction contract specified")).

[238] *See Apex*, 581 S.W.2d at 577 (the Court there found that the contractor had sufficient grounds to fire the subcontractor for defaults and delays, and the completion of the subcontractor's work could be charged to the subcontractor when it exceeded the original contract price).

[239] Adv. Doc. 65 at 5-6.

and Catamount suffered damages in the amount of $2,841,177.00. Thus, the Court finds in favor of Catamount as to Count I of the Complaint.

II. Count II: Fraudulent Transfer under Fla. § 726.105

Florida Statute § 726.105(1) provides two theories for fraudulent transfer claims: actual fraud under subsection (1)(a) and constructive fraud under subsection (1)(b), each of which must be established by a preponderance of the evidence.[240] To prevail under subsection (1)(a), Catamount must establish that (1) it was a creditor to be defrauded, (2) JAX made the transfer with actual intent to hinder, delay, or defraud Catamount, and (3) there was a transfer of property which could have been used to pay the debt due.[241] Under FUFTA, "transfer" includes "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset," including the payment of money.[242]

To determine actual intent, courts consider the eleven statutory badges of fraud, including whether the transfer was made to an insider, concealed, made while the debtor was insolvent, or made without reasonably equivalent value.[243] Courts may also "consider the totality of the circumstances [to] determine whether any 'badges of fraud' are present in connection with a particular transfer."[244] Generally, a

[240] Fla. Stat. §§ 726.105(1)(a)-(b); *In re Orton,* No. 3:17-AP-0148-JAF, 2018 WL 1577927, at *2 (Bankr. M.D. Fla. Mar. 28, 2018). While Kentucky law is applicable to Count I, the Court will apply Florida fraudulent transfer laws to Count II and III as the Complaint alleges these actions under Florida law.
[241] Fla. Stat. § 726.105(1)(a); *Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296, 1302 (11th Cir. 2020) (citing *Wiand v. Lee*, 753 F.3d 1194, 1199-1200 (11th Cir. 2014)).
[242] Fla. Stat. § 726.102(14).
[243] Fla. Stat. § 726.105(2); *In re ATIF, Inc.,* 160 F.4th 1124, 1140 (11th Cir. 2025).
[244] *In re Dealers Agency Services, Inc.,* 380 B.R. 608, 613 (Bankr. M.D. Fla. 2007).

combination of several badges of fraud may establish a prima facie case and create a rebuttable presumption that the transactions are void,[245] which the debtor may rebut with evidence demonstrating the absence of an intent to hinder, delay, or defraud creditors.[246] Evidence that the debtor received value may help rebut the presumption of fraud.[247] The court may apply a totality of the circumstances test in determining reasonably equivalent value.[248] The party challenging the transfer has the burden of proving the debtor received less than reasonably equivalent value.[249] Under FUFTA, a debtor is insolvent when its debts exceed its assets at a fair valuation,[250] or when a debtor is generally not paying its debts as they become due.[251] Additionally, an insider of a corporate debtor includes a director, officer, person in control of the debtor, or relative of any of those individuals.[252]

To prevail under subsection (1)(b), Catamount must establish JAX did not receive reasonably equivalent value and either had unreasonably small remaining assets or believed, or reasonably should have believed, that it would incur debts beyond its ability to pay.[253] Value is given if, in exchange for the transfer, property is transferred

---

[245] *Wiand,* 753 F.3d at 1200 (citing *Gen. Elec. Co. v. Chuly Intern., LLC*, 118 So. 3d 325, 327 (Fla. 3d DCA 2013); *Johnson v. Dowell,* 592 So. 2d 1194, 1197 (Fla. 2d DCA 1992)).
[246] *Mejia v. Ruiz*, 985 So. 2d 1109, 1113 (Fla. 3d DCA 2008) (citing *United States v. Fernon*, 640 F.2d 609, 613 (5th Cir. 1981)).
[247] *Gen. Elec. Co.,* 118 So. 3d at 328; *Mejia*, 985 So. 2d at 1111.
[248] *Official Comm. of Unsecured Creditors v. State of Fla. (In re Tower Env't, Inc.),* 260 B.R. 213, 225 (Bankr. M.D. Fla. 1998).
[249] *In re ATIF, Inc.,* 160 F.4th at 1142.
[250] Fla. Stat. § 726.103(1).
[251] Fla. Stat. § 726.103(2).
[252] Fla. Stat. § 726.102(8)(b).
[253] Fla. Stat. § 726.105(1)(b).

or an antecedent debt is secured or satisfied,[254] and reasonably equivalent value need not be dollar-for-dollar.[255] Courts have recognized that the analysis for reasonably equivalent value focuses on the benefit actually obtained by the debtor, and as such, value is measured from the debtor's point of view, not the transferee's.[256]

Catamount alleges JAX fraudulently transferred funds to Lowery, Mrs. Lowery, LDDV, and other insiders to hinder or delay payment of debt, JAX did not receive reasonably equivalent value, JAX knew of Catamount's claim and believed or reasonably should have believed that it would incur debts beyond its ability to pay, and Lowery is personally liable for the value of these transfers under § 726.105.

Catamount alleged multiple badges of fraud, including that transfers were made to insiders with actual fraudulent intent, without reasonably equivalent value, and JAX was insolvent at the time of the transfers. Those badges, however, are rebuttable, and, ultimately, based on the record before the Court and the totality of the circumstances, Catamount did not establish by a preponderance of the evidence that JAX acted with actual fraudulent intent, received less than reasonably equivalent value, or that JAX was insolvent at the time of the transfers.

*a. The Pre-Sale Transfers*

Although Catamount alleges the Pre-Sale Transfers were made to insiders, without reasonably equivalent value, during a period of insolvency, those

---

[254] Fla. Stat. § 726.104(1).
[255] *In re Berkman,* 517 B.R. 288, 302 (Bankr. M.D. Fla. 2014); *In re Advanced Telecomm. Network, Inc.*, 490 F.3d 1325, 1336 (11th Cir. 2007).
[256] *In re Berkman,* 517 B.R. at 301.

circumstances, simply create a rebuttable presumption of actual fraud. First, Defendants' Post-Trial Brief disputes Catamount's contention Defendants knew of its existence as a creditor at the time of the Termination Letter, as Defendants stated they never received any billings, communications, or other financial information related to the allegations of breach and damages prior to the filing of the District Court Case.

Second, Lowery testified the Pre-Sale Transfers related to the Trust Truist Account in January 2023 and February 2023 were related to the Subdivision Sale Proceeds, and he used personal funds to pay JAX expenses with the anticipation he would receive the Subdivision Sale Proceeds as value in exchange for the transfers. As to the Pre-Sale Transfers related to the 3010 AMEX, Catamount failed to provide evidence such as account statements to prove who the owner of the account was, and there was less than reasonably equivalent value received in exchange. Catamount bears the burden of proof to show that these were in fact fraudulent transfers. As such, based on the totality of the circumstances and the record before the Court, Catamount did not establish by a preponderance of the evidence that JAX made the Pre-Sale Transfers with actual intent to hinder, delay, or defraud Catamount. Nor did Catamount establish that JAX received less than reasonably equivalent value for the Pre-Sale Transfers.[257]

b. *The Post-Sale Transfers*

---

[257] Catamount also failed to prove who owned the 3010 AMEX account. Even if the Court were to find that the Pre-Sale Transfers were fraudulent and benefitted Lowery and as such were avoidable, the ruling in Count V of the Complaint provides that any claims personally against Lowery are dischargeable.

As to the Lowery 2005 AMEX, Unterholzner determined JAX and JAX HVAC made a payment in the amount of $584,357.00, initially identifying $436,761.47 in business expenses as value in exchange. Lowery, however, identified several charges miscategorized as personal or unknown which were business expenses including: $34,551.00 in Daily's Place Charges, $23,747.50 in Jaguars Charges, $29,986.07 for the Arena Charge, $36,250.00 in Postillion Charges, $27,379.99 in AT&T Charges, and $61,036.78 in Burr & Forman Charges. Taking these adjustments into account, business charges on the Lowery 2005 AMEX totaled $649,672.81, exceeding the JAX and JAX HVAC's payments by $65,315.53.

As to the LDDV AMEX, Unterholzner identified $241,661.00 in payments from the JAX MS 5092 Account to the LDDV AMEX and initially identified $106,246.92 in value received in exchange. Lowery testified, however, that the June 23 Payment was used to purchase materials for a JAX project in Miami. Taking the June 23 Payment of $187,478.38 into account, business spending totaled $347,907.92, exceeding the payments by JAX.

Although the evidence establishes transfers between JAX and accounts associated with Lowery, Catamount has not established by a preponderance of the evidence that the Post-Sale Transfers were made with actual intent to hinder, delay, or defraud. Nor did Catamount establish by a preponderance of the evidence that JAX received less than reasonably equivalent value.

While there is evidence that JAX was financially troubled, the record before the Court does not support finding JAX was insolvent at the time of the Pre-Sale and Post-

Sale Transfers. Based on the foregoing, the record before the Court, and the totality of the circumstances, the Court finds in favor of Defendants as to Count II of the Complaint.[258]

III. Count III: Fraudulent Transfer under Fla. § 726.106

A present creditor seeking to void a transfer must prove by a preponderance of the evidence that the conveyance was fraudulent.[259] Under § 726.106(1), a transfer is fraudulent if a debtor made the transfer without receiving reasonably equivalent value and was insolvent at that time or became insolvent as a result of the transfer or obligation.[260] The court may apply a totality of the circumstances test in determining reasonably equivalent value.[261] The party challenging the transfer has the burden of proving the debtor received less than reasonably equivalent value.[262] Alternatively, under § 726.106(2), a transfer is fraudulent if made to an insider for an antecedent debt while the debtor was insolvent and "the insider had reasonable cause to believe that the debtor was insolvent."[263] As previously stated, a debtor is insolvent when its debts exceed its assets at a fair valuation,[264] or when a debtor is generally not paying its debts as they become due.[265]

---

[258] As previously stated, even if the Court were to find that transfers associated to Lowery were made with actual fraud, the ruling in Count V of the Complaint provides that any claims against Lowery personally are dischargeable.
[259] *In re Berkman,* 517 B.R. at 300; *Mejia,* 985 So. 2d at 1113.
[260] Fla. Stat. § 726.106(1).
[261] *In re Tower Env't, Inc.,* 260 B.R. at 225.
[262] *In re ATIF, Inc.,* 160 F.4th at 1142.
[263] Fla. Stat. § 726.106(2).
[264] Fla. Stat. § 726.103(1).
[265] Fla. Stat. § 726.103(2).

Catamount alleges the transfers of the Property Sale Proceeds to Lowery, Mrs. Lowery, and/or XAJ were fraudulent under Fla. Stat. § 726.106(1), as JAX did not receive reasonably equivalent value and was insolvent when the transfers occurred or became insolvent because of the transfers. Catamount also alleges that the Shareholder Loans were made without JAX receiving reasonably equivalent value, that repayment of the 2023 Shareholder Loan was a transfer to an insider on account of an antecedent debt while JAX was insolvent, and that Lowery is personally liable for the value of these transfers under §§ 726.106(1)-(2).

Catamount has not established by a preponderance of the evidence that the Pre-Sale and Post-Sale Transfers and the Shareholder Loans were fraudulent under Fla. Stat. § 726.106. As to § 726.106(1), Catamount failed to prove by a preponderance of the evidence that the Pre-Sale and Post-Sale Transfers and Shareholder Loans were made for less than reasonably equivalent value. As provided above, Catamount failed to provide sufficient documentation necessary to show that JAX received less than reasonably equivalent value for the Pre-Sale and Post-Sale Transfers. Additionally, Catamount failed to provide bank statements or documentation regarding the Shareholder Loans beyond the 2023 and 2024 XAJ Tax Returns. As such, the Court is unable to determine whether there was less than reasonably equivalent value.[266]

---

[266] Unterholzner did not draw any conclusions surrounding the Shareholder Loans, testifying that while it could be suggested Lowery received the Shareholder Loans, there was no documentation of the existence of the loans themselves or value received, and no other evidence or testimony was provided to support Catamount's contention.

As to § 726.106(2), Catamount has not establish by a preponderance of the evidence that the alleged repayment of the Shareholder Loan was to an insider on account of an antecedent debt while insolvent.[267] Here, similarly to the Court's findings as to § 726.106(1), Catamount failed to provide any documentation beyond the 2023 and 2024 Tax Returns regarding the repayment of the 2023 Shareholder Loan. While Catamount asserts the Shareholder Loans are separate from and not duplicative of the Pre-Sale and Post-Sale Transfers, Unterholzner did not match Shareholder Loans with JAX bank accounts and AMEX records and the Court was also not able to come to this conclusion based on the record.[268] As such, the evidence did not establish that JAX repaid an insider on account of an antecedent debt while insolvent or that the insider had reasonable cause to believe that JAX was insolvent. Based on the foregoing and the totality of the circumstances, the Court finds in favor of Defendants as to Count III of the Complaint.

IV. Count IV: Piercing the Corporate Veil

Under Florida law, to pierce the corporate veil, and hold a corporation's owner liable,[269] the plaintiff must prove, by a preponderance of the evidence, that (1) a

[267] Adv. Doc. 46.

[268] Unterholzner noted in her expert report that she was not provided with all JAX bank, investment, and credit card statements. Accordingly, there was not a complete record to make a determination on the Shareholder Loans and many of the noted transfers. While Catamount may assert that the additional necessary evidence was unavailable due to Lowery's failure to produce, Lowery does not bear the burden of proof. There was also no explanation from Catamount as to why it did not seek discovery earlier and directly from certain sources, such as Amex.

[269] *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011).

shareholder dominated the corporation so that the corporation was nonexistent, and the shareholder was the alter ego of the corporation, (2) the corporate form was used fraudulently or for an improper purpose, and (3) the fraudulent or improper use caused injury to the claimant.[270]

As to the first element, mere ownership or control, even when coupled with a failure to observe corporate formalities, is insufficient; the relevant inquiry is whether the corporation lacked an existence independent of its shareholder.[271] To satisfy the second element, a fraudulent or improper purpose must be shown, such as "a subterfuge to mislead or defraud creditors, to hide assets, [or] to evade the requirements of a statute."[272] The third element requires a causal connection between the shareholder's fraudulent or improper use of the corporate form and the plaintiff's injuries.[273]

At Trial, Catamount presented no evidence or argument specifically directed toward piercing JAX's corporate veil, and Catamount did not address Count IV in its Post-Trial Brief. Accordingly, Count IV appears to have been abandoned.[274] Nonetheless, the Court will address the merits of the claim.

---

[270] *In re Paul C. Larsen, P.A.*, 610 B.R. 684, 688 (Bankr. M.D. Fla. 2019), *aff'd,* 626 B.R. 446 (M.D. Fla. 2021) (citing *In re Batcheler*, 600 B.R. 680, 689 (Bankr. S.D. Fla. 2019)).
[271] *Id.*
[272] *W.P. Prods., Inc. v. Tramontina U.S.A., Inc.*, 101 F.4th 787, 791 (11th Cir. 2024) (quoting *Lipsig v. Ramlawi*, 760 So. 2d 170, 187 (Fla. 3d DCA 2000)).
[273] *In re Larsen*, 610 B.R. 684, 691-92 (Bankr. M.D. Fla. 2019).
[274] *See In re McIntosh,* 320 B.R. 22, 28 n.1 (Bankr. M.D. Fla. 2005) (the court found that when no evidence is presented at trial a count can be seen as abandoned by the plaintiff).

The evidence presented in this Proceeding does not establish that Lowery dominated JAX to such an extent that JAX lacked an independent corporate existence. JAX was an active, for-profit corporation and maintained multiple projects at once. While Lowery exercised a high degree of control over the operations and decisions of JAX, ownership and control alone are insufficient to establish that JAX was merely Lowery's alter ego.[275] Accordingly, Catamount failed to establish the first element.

Nor has Catamount established the remaining elements. As discussed above, Catamount failed to prove that Lowery used JAX to effectuate fraudulent transfers or otherwise used the corporate form for a fraudulent or improper purpose. Without such a showing, Catamount cannot establish that an improper use caused its injuries. Moreover, the alleged damages resulted from JAX's breach of contract with Catamount, not from Lowery's improper use of JAX. As a result, Catamount failed to establish by a preponderance of the evidence the elements necessary to pierce the corporate veil. Based on the foregoing and the totality of the circumstances, the Court finds in favor of Defendants as to Count IV of the Complaint.

V. Count V: Nondischargeability under 11 U.S.C. § 523

[275] *In re Larsen*, 610 B.R. at 688 (there the debtor was an active profit corporation until it filed bankruptcy, filed annual reports with the Florida Secretary of State, and maintained a bank account in its sole name. Although it did not maintain other corporate records "[e]ven if Debtor [] did not follow corporate formalities, this alone is not enough to pierce the corporate veil.") (citations omitted).

The preponderance of the evidence standard applies to all exceptions to the dischargeability of debts under 11 U.S.C. § 523(a)[276] and requires the creditor to establish that the existence of a fact is more probable than its nonexistence.[277] Exceptions to discharge are strictly construed against the creditor and liberally in favor of the debtor.[278] Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud."[279]

Actual fraud is broad and encompasses any fraud involving "moral turpitude or intentional wrong."[280] Thus, actual fraud under § 523(a)(2)(A) does not require a false representation and may encompass fraudulent conveyance schemes.[281] Nevertheless, § 523(a)(2)(A) requires that money or property giving rise to the debt be "obtained by" the fraud.[282] Accordingly, when nondischargeability is premised on a fraudulent transfer, the creditor must establish that the debtor obtained money, property, or

---

[276] *Grogan v. Garner,* 498 U.S. 279, 291 (1991); *United States v. Watkins,* 10 F.4th 1179, 1184 (11th Cir. 2021) (citing *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (internal quotation omitted)).
[277] *Watkins,* 10 F.4th at 1184-1185 (citing *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993) (internal quotation omitted)).
[278] *Harris v. Jayo (In re Harris),* 3 F.4th 1339, 1345 (11th Cir. 2021) (citing *Hudson v. Raggio & Raggio, Inc. (In re Hudson),* 107 F.3d 355, 356 (5th Cir. 1997); *Gleason v. Thaw*, 236 U.S. 558 (1915)).
[279] 11 U.S.C. § 523(a)(2)(A).
[280] *Husky Int'l Elecs., Inc. v. Ritz,* 578 U.S. 355, 360 (2016) (quoting *Neal v. Clark,* 95 U.S. 704, 709 (1878)).
[281] *Id.* at 359-360.
[282] *SE Property Holdings, LLC v. Gaddy (In re Gaddy)*, 977 F.3d 1051, 1057-58 (11th Cir. 2020).

services by actual fraud and that the debt sought to be excepted from discharge resulted from the debtor's fraudulent receipt.[283]

Here, Catamount has not established actual fraud as to Lowery. As discussed above, Catamount failed to prove by a preponderance of the evidence that the Pre-Sale and Post-Sale Transfers and Shareholder Loans constituted fraudulent transfers involving Lowery. Moreover, even assuming the transfers constituted actual fraud, Catamount has not established that the debt it seeks to except from discharge resulted from those transfers.

In *In re Gaddy,* the Eleventh Circuit held that a debtor's fraudulent transfers, which were made after incurring a contractual obligation, did not render the preexisting debt nondischargeable under § 523(a)(2)(A) because the debt was not "obtained by" the alleged fraud and the transfers were, if anything, an alleged effort to thwart collection of an already existing obligation.[284] The Eleventh Circuit further noted that a § 523(a)(2)(A) claim fails when the plaintiff "did not contend that the underlying debt from the guaranties was obtained by fraud or was anything other than a standard contract debt."[285] The Eleventh Circuit subsequently confirmed that *Husky* and *In re Gaddy* require a creditor to establish both the debtor's fraudulent receipt of money or property and that the underlying debt sought to be excepted from discharge resulted from the fraudulent receipt.[286]

---

[283] *PRN Real Est. & Invs., Ltd. v. Cole,* 85 F.4th 1324, 1346 (11th Cir. 2023).
[284] *In re Gaddy*, 977 F.3d at 1057-58.
[285] *Id.* at 1058.
[286] *PRN Real Est.,* 85 F.4th at 1346.

Following the Eleventh Circuit's reasoning, JAX's underlying debt to Catamount arose from JAX's breach of contract, which existed before the alleged Pre-Sale and Post-Sale Transfers. Even if Catamount had satisfied its burden of proof as to Lowery's receipt of fraudulent transfers, such receipt does not in and of itself translate to a finding that the debt should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A). Catamount alleges that Lowery's subsequent participation in the Pre-Sale and Post-Sale Transfers and Shareholder Loans constituted actual fraud on which Catamount justifiably relied and that caused Catamount's loss in the amount of the debt. However, even if the Pre-Sale and Post-Sale Transfers and Shareholder Loans constituted actual fraud, they would not transform such debt into a debt "obtained by" fraud under § 523(a)(2)(A).

Accordingly, Catamount failed to prove by a preponderance of the evidence that any debt owed by Lowery to Catamount was obtained by actual fraud. The Court therefore finds in favor of Lowery and against Catamount as to Count V, and any such debt is not excepted from Lowery's discharge under § 523(a)(2)(A).

In conclusion, the Court finds in favor of Catamount as to Count I; in favor of Defendants as to Counts II, III, and IV; and in favor of Lowery as to Count V. The Court will enter a separate judgment consistent with these Findings of Fact and Conclusions of Law.